UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RANDY D. O'LEARY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:09-cv-00175-JAW |
| | ) | |
| INFRASOURCE TRANSMISSION | ) | |
| SERVICES COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

The Court concludes that the Plaintiff, a former employee of the Defendant construction company, produced sufficient evidence when viewed in the light most favorable to him to generate jury questions as to whether the Defendant violated his rights under the Maine Human Rights Act (MHRA) by terminating his employment because it regarded him as being disabled and/or because of his record of disability. The Court also concludes that the Plaintiff has proffered sufficient evidence to generate a factual question as to whether the Defendant took its actions with malice or with reckless indifference to the Plaintiff's legal rights and therefore his claim for punitive damages survives the Defendant's dispositive motion. The Court denies the Defendant's motion for summary judgment.

## I. STATEMENT OF FACTS

### A. Procedural History

On April 2, 2009, Randy D. O'Leary filed a complaint in the Penobscot County Superior Court for the state of Maine against InfraSource, alleging that it violated the Maine Human Rights Act (MHRA), 5 M.R.S. § 4551, *et seq.,* by

discriminating against him on the basis of his physical disability. *Notice of Removal* Attach. 3 (Docket # 1) (*Compl.*) . On May 5, 2009, InfraSource removed the case to this Court on the basis of its diversity jurisdiction, 18 U.S.C. § 1332. *Notice of Removal*. On June 30, 2010, InfraSource moved for summary judgment. *Mot. for Summ. J. by Def. InfraSource Transmission Serv. Co.* (Docket # 32) (*Def.'s Mot.*). On August 6, 2010, Mr. O'Leary responded. *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (Docket # 41) (*Pl.'s Opp'n*). On August 20, 2010, InfraSource replied. *Reply to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J.* (Docket # 43) (*Def.'s Reply*).

## B.    The Dispute[1]

InfraSource was hired to build an electrical power line from Orrington to Princeton, Maine; the project was called the Northeast Reliability Interconnect (the NRI project). *Statement of Uncontroverted Material Facts by InfraSource Transmission Company* ¶ 1 (Docket # 33) (DSMF).[2] In August 2006, Mr. O'Leary met Joe Stone, an InfraSource supervisor, about working on the NRI project. DSMF ¶ 2; PRDSMF ¶ 2. Mr. O'Leary filled out an employment application and a NEW HIRE/RE-HIRE INFORMATION form. DSMF ¶ 2; PRDSMF ¶ 2. When Mr. O'Leary applied for the InfraSource job, he told Mr. Stone that he was concerned

---

[1] In accordance with the "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. O'Leary's theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

[2] Mr. O'Leary objected to this statement of material fact on two grounds: lack of foundation and lack of personal knowledge. Without waiving his objection, however, he admitted the statements. *Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts and Statement of Additional Facts* (Docket # 42) (the Plaintiff's responses are referred to as PRDSMF; the Plaintiff's additional facts are referred to as PSAMF). This is a frivolous objection. Mr. O'Leary is clearly competent to testify about the nature of the InfraSource project he was working on. The Court overrules Mr. O'Leary's objection.

about leaving a federally funded job at the University of Maine and Mr. Stone reassured him that his work would last through November of 2007 and that there would be future opportunities that would likely involve traveling out of state. DSMF ¶ 3; PRDSMF ¶ 3; PSAMF ¶ 55; *Response to Pl.'s Statement of Additional Material Facts by InfraSource Transmission Services Company* ¶ 55 (Docket # 44) (DRPSAMF). Mr. O'Leary began working in August 2006 as a Groundsman 6 or 7, a general labor position. DSMF ¶ 2; PRDSMF ¶ 2. Mr. O'Leary was part of the can crew and the work involved setting cans, which are large structures to hold power lines in place. PSAMF ¶ 56; DRPSAMF ¶ 56. Setting cans involves the use of an excavator, a backhoe, and related equipment and a hole ram, which is a big hammer that pounds rock. PSAMF ¶ 57; DRPSAMF ¶ 57. Mr. O'Leary was not assigned to the can crew every day but did different jobs, including driving a fork truck to transport culverts using the loader to unload and set mats, loading rocks onto dump trucks, driving the fuel truck, and fueling up equipment. PSAMF ¶ 58; DRPSAMF ¶ 58.

On November 26, 2006, Mr. O'Leary hurt his lower back while at work, and Mr. O'Leary's doctor restricted him to "light duty" work. DSMF ¶ 7; PRDSMF ¶ 7. Mr. O'Leary missed one day of work before seeing a doctor, and InfraSource accommodated his restriction by placing him on light duty for one week. DSMF ¶ 8; PRDSMF ¶ 8. Following this back injury, InfraSource's workers' compensation carrier denied him benefits. PASMF ¶ 59; DRPSAMF ¶ 59. Mr. O'Leary told W.D. Guess at InfraSource about the denial letter and that his doctor had referred him to

a chiropractor. PSAMF ¶ 60; DRPSAMF ¶ 60. Mr. O'Leary says that Mr. Guess negotiated with him and told him that InfraSource would pay him two weeks pay so long as Mr. O'Leary used his own insurance to pay for medical visits.[3] PSAMF ¶ 60. During this interval, Mr. O'Leary saw the chiropractor about six times and had one more visit with his physician, which were paid either through his health insurance or out of his own pocket. PSAMF ¶ 61; DRPSAMF ¶ 61.

Mr. O'Leary returned to work in mid-December without any restrictions. DSMF ¶ 11; PRDSMF ¶ 11. When Mr. O'Leary returned to regular work after those two weeks, he was assigned to work with a new crew under crew leader Barry Smith, who had never done canning before. PSAMF ¶ 62; DRPSAMF ¶ 62. Mr. O'Leary was assigned to instruct Mr. Smith on setting cans due to his experience in this area. PSAMF ¶ 62; DRPSAMF ¶ 62. While working on Mr. Smith's crew, Mr. O'Leary was also assigned to perform pre-environmental smoothing, which involved cleaning up the site, smoothing it out, burying big rocks and getting the site ready for the environmental crew to hay and patch grass.[4] PASMF ¶ 63; DRPSAMF ¶ 63. Mr. O'Leary worked for InfraSource from mid-December 2006 to January 10, 2007 without incident. DSMF ¶ 12; PRDSMF ¶ 12.

The morning of January 10, 2007 at the beginning of his shift, Mr. O'Leary slipped on ice, twisted his ankle, and heard a pop. DSMF ¶ 12; PRDSMF ¶ 12.

---

[3] InfraSource has a different version, emphasizing that Mr. Guess offered Mr. O'Leary two weeks off with pay so that Mr. O'Leary could recuperate. DRPSAMF ¶ 60. InfraSource admits that Mr. Guess told Mr. O'Leary he would have to use his health insurance to pay for the treatment costs related to his back injury. *Id*. The difference between the two versions is tonal but as it is required to do at this stage in the proceeding, the Court has accepted Mr. O'Leary's version.

[4] InfraSource says that the entire Smith crew, not just Mr. O'Leary, was assigned to this work. DRPSAMF ¶ 63. The Court has accepted Mr. O'Leary's version.

Despite feeling pain in his ankle, Mr. O'Leary worked the rest of the day, but by the end of the day, his ankle had swelled up and turned black and blue. DSMF ¶ 12; PRDSMF ¶ 12. He showed his ankle to Adam Smith, one of InfraSource's safety employees, and Mr. Smith suggested he go home, and ice and elevate his ankle. DSMF ¶ 13; PRDSMF ¶ 13. The next day, Mr. O'Leary reported to Mr. Smith that his ankle had not improved, and Mr. Smith recommended he return home and soak his ankle in Epsom salt to see if it improved. DSMF ¶ 14; PRDSMF ¶ 14; PSAMF ¶ 64; DRPSAMF ¶ 64. Later that day, Mr. O'Leary called the office and spoke with a woman named Alana[5], who told him not to go to the doctor until someone called him back. PSAMF ¶ 65; DRPSAMF ¶ 65. No one returned Mr. O'Leary's call and the next day Mr. O'Leary called the office and told Alana that he was going to see a doctor, where he was going and when. PSAMF ¶ 66; DRPSAMF ¶ 66.

Mr. O'Leary went to his family doctor, who took x-rays and told Mr. O'Leary that he had broken his ankle. DSMF ¶ 15; PRDSMF ¶ 15. Mr. Smith showed up at the doctor's office as Mr. O'Leary was leaving and said that he wanted to see the x-rays. PSAMF ¶¶ 67-68; DRPSAMF ¶¶ 67-68. Mr. Smith asked Mr. O'Leary if it was okay for him to accompany him to the hospital and attend the hospital visit. PSAMF ¶ 68; DRPSAM ¶ 68.

On January 15, 2007, Mr. O'Leary went to a specialist at Orthopedic Associates and the surgeon recommended surgery to align the ankle bones so that they would heal properly. DSMF ¶ 18; PRDSMF ¶ 18. Mr. O'Leary underwent

---

[5] Alana is also referred to as Lana in the depositions. DRPSAMF ¶ 66; *see also* PRDSMF Attach 3 (*O'Leary Dep.*).

surgery on January 17, 2007. DSMF ¶ 19; PRDSMF ¶ 19. The surgeon inserted

plates and screws to stabilize the fracture. PASMF ¶ 69; DRPSAMF ¶ 69.

On January 15, 2007, Mr. O'Leary began a twelve-week leave of absence from

his job at InfraSource as a result of the January 10, 2007 ankle injury.[6] DSMF ¶

16; PRDSMF ¶ 16. As of January 15, 2007, InfraSource had completed

approximately 61.8% of the excavation work on the NRI project.[7] DSMF ¶ 17;

PRDSMF ¶ 17.

---

[6] Mr. O'Leary interposed a qualified response to Defendant's Statement of Material Fact paragraph 16, stating that although he learned on January 16, 2007 that he would need surgery, "the timing of his return to work was up in the air at that point." PRDSMF ¶ 16. The Court rejects the qualified response. Defendant's Statement of Material Fact paragraph 16 neither states nor implies that when he left work on January 15, 2007, Mr. O'Leary knew that he was going to be absent from work for twelve weeks. The qualified response is non-responsive.

[7] Mr. O'Leary denied this statement and objected on hearsay and lack of foundation grounds. PRDSMF ¶ 17. Specifically, Mr. O'Leary observes that Maria Pedrick, the "other qualified witness" for documents supporting this statement, began work with InfraSource after the events that the documents describe. *Id.* He also objects on the ground that Ms. Pedrick does not establish an appropriate foundation for her knowledge of the business records at InfraSource. *Id.*

Mr. O'Leary's first objection is frivolous. It improperly conflates the "person with knowledge" requirement of Rule 803(6) with the "custodian or other qualified witness" requirement of Rule 803(6). The "other qualified witness" does not have to be the person who created the business record. *United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992). In fact, as the First Circuit noted in *Doe*, there is no requirement that the business records must have been prepared by the entity that has custody of them so long as they were created in the regular course of some entity's business. *Id.*; Joseph M. McLaughlin, Jack B. Weinstein, Margaret A. Berger, WEINSTEIN'S FEDERAL EVID. SECOND ED. § 803.08[8][a] (2010 ed.) (WEINSTEIN'S). If Mr. O'Leary were correct, no business could ever admit a business record under Rule 803(6) that had been created before the hiring date of its most senior employee, a proposition that is nonsensical.

Mr. O'Leary's second objection has at least a patina of legitimacy. InfraSource submitted the affidavit of a Maria Pedrick, who states she has worked "as an independent Human Resources Consultant with Infrasource, Inc. and Infrasource Transmission Services Company since April of 2007, including Human Resources support for ITS on the NRI project in the State of Maine." *Aff. of Maria Pedrick* ¶ 1. She says that the attached InfraSource records are "true and correct" copies. *Id.* ¶¶ 2-4. One record is InfraSource's Equal Employment Opportunity Statement but the other two are weekly reports which reflect the progress of the NRI project. *Id.*

"The phrase 'other qualified witness' is given a very broad interpretation." WEINSTEIN'S § 803.08[8][a]. The records custodian "need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business. The witness need not have personal knowledge of the actual creation of the documents or have personally assembled the records." *Id.* Presumably, a person working in Human Resources at InfraSource would have to be aware not only of its Equal Employment Opportunity records, but also of the extent of a major project's completion so that she could make workforce

Shortly after the surgery, Mr. O'Leary spoke with Adam Smith, told him how his surgery had gone, and when his follow-up appointment was scheduled. DSMF ¶ 20, PRDSMF ¶ 20. At a later time, Mr. O'Leary told Mr. Smith that the doctor had put him out of work for eight weeks and would reevaluate him then. DSMF ¶ 20, PRDSMF ¶ 20.

The last week of February 2007, Mr. O'Leary was told that there was a "big meeting" at InfraSource during the first week of March and if he wanted to continue to work on the NRI project, he should attend. DSMF ¶ 54; PRDSMF ¶ 54; PSAMF ¶ 71; DRPSAMF ¶ 71. Mr. O'Leary attended the meeting. PSAMF ¶ 72; DRPSAMF ¶ 72. He saw Adam Smith there but Mr. Smith did not talk with Mr. O'Leary. PSAMF ¶ 72; DRPSAMF ¶ 72. At the March meeting, Mr. O'Leary spoke with Barry Smith, who was anxious for Mr. O'Leary to return to the can crew and told him that most of the cans were not yet set. PSAMF ¶ 73; DRPSAMF ¶ 73. After the March 2007 safety meeting, Mr. O'Leary spoke with Adam Smith and told him that he was not going to be released to return to work, that the doctor had put him out of work for eight weeks, after which he would reevaluate his condition, and that Mr. O'Leary hoped to return to work thereafter. PSAMF ¶ 74; DRPSAMF ¶

adjustments. Accordingly, especially in the absence of contrary evidence, the Court concludes that the Pedrick affidavit is sufficient to qualify her as an "other qualified witness" under Rule 803(6). *Haag v. United States*, 485 F.3d 1, 3 (1st Cir. 2007).

Once the documents are properly admitted as business records, Mr. O'Leary's hearsay objection fails. Finally, the Court observes that a cursory review of the InfraSource records attached to Ms. Pedrick's affidavit clearly indicates that they are InfraSource business records. This is a motion for summary judgment, not a trial, and simply because an evidentiary objection can be made does not mean it should.

Although Mr. O'Leary denied the truth of this statement of material fact, he cited no legitimate basis for the denial, and the Court refuses to credit the denial. Instead, the Court treats Defendant's Statement of Material Fact ¶ 17 as true for purposes of InfraSource's motion.

74.  Mr. Smith told Mr. O'Leary that when he returned to work, InfraSource would assign him to an appropriate job.  PSAMF ¶ 74; DRPSAMF ¶ 74.  While he was at the Costigan yard in late March 2007, Mr. O'Leary saw his medical records from Orthopaedic Associates on Adam Smith's computer screen.  PSAMF ¶ 80; DRPSAMF ¶ 80.

On March 27, 2007, while Mr. O'Leary was still recovering from the surgery, Mr. Stone came to Mr. O'Leary's home, pounded on the door, and asked him why he had not maintained contact with Mr. Smith.  DSMF ¶ 21; PRDSMF ¶ 21; PSAMF ¶ 75; DRPSAMF ¶ 75.  Mr. Stone told Mr. O'Leary that Mr. Smith had lost his telephone number.  DSMF ¶ 21; PRDSMF ¶ 21; PSAMF ¶ 76; DRPSAMF ¶ 76.  Mr. O'Leary was surprised to learn what Mr. Stone was saying since he had left messages for Mr. Smith to contact him.  DSMF ¶ 21; PRDSMF ¶ 21; PSAMF ¶ 76; DRPSAMF ¶ 76.  Mr. O'Leary had been in phone contract with InfraSource on January 19, 20, 23, February 1, 14, 23, March 6 and April 7, 2007.  PSAMF ¶ 77; DRPSAMF ¶ 77.  Mr. Stone told Mr. O'Leary that he wanted him to return to work and asked him about his recovery.  DSMF ¶ 21; PRDSMF ¶ 21.  Mr. O'Leary replied that he thought he would return to work when his doctor released him to do so.  DSMF ¶ 21; PRDSMF ¶ 21.  Mr. Stone asked Mr. O'Leary to convey that same information to Mr. Smith in person and Mr. O'Leary did so.  DSMF ¶ 21; PRDSMF ¶ 21.  During this discussion, Mr. O'Leary felt that Mr. Stone was trying to bully him back to work.  DSMF ¶ 22; PRDSMF ¶ 22.

On April 3, 2007, Mr. O'Leary's doctor prepared a note stating that "He (referring to [Mr.] O'Leary) is all better" and "Work Status: He is ready to go back to work, Monday, 4/9, building power lines." DSMF ¶ 24; PRDSMF ¶ 24. In a separate note, the doctor released Mr. O'Leary to full duty, without any restrictions. DSMF ¶ 24; PRDSMF ¶ 24. At an April 3, 2007 appointment with his physician, Mr. O'Leary received a "Practitioner's Report" form, which stated that he could return to "regular duty" on April 9, 2007 and a general note saying that he could return to work on April 9. DSMF ¶ 25; PRDSMF ¶ 25.

On April 6, 2007, Mr. O'Leary went to the InfraSource yard in Costigan to speak with Mr. Smith about returning to work, and presented Mr. Smith with the doctor's return to work documents. DSMF ¶ 25, 27; PRDSMF ¶ 25, 27. Mr. O'Leary told Mr. Smith that his doctor had released him to return to full duty and he felt ready to return to work. DSMF ¶ 27; PRDSMF ¶ 27. Mr. Smith replied that they should go and speak with Mr. Stone to determine how to proceed. DSMF ¶ 27; PRDSMF ¶ 27. Mr. Smith found Mr. Stone in his office and briefly spoke to him. DSMF ¶ 28; PRDSMF ¶ 28. Mr. Smith told Mr. O'Leary that Mr. Stone did not tell him where to assign Mr. O'Leary, and Mr. Smith suggested they speak with another InfraSource supervisor, Gordon Rubendall, who was the Head Foundation Superintendant for the NRI Project, which included oversight of the excavation portion of the project. DSMF ¶ 28; PRDSMF ¶ 28.

Mr. Smith and Mr. O'Leary found Mr. Rubendall sitting in his truck. DSMF ¶ 29; PRDSMF ¶ 29. Upon seeing Mr. O'Leary for the first time since he had left

work in January, Mr. Rubendall said "Where in the hell [have you] been?" DSMF ¶ 29; PRDSMF ¶ 29. He then asked Mr. O'Leary: "Why have you been out of work for 12 weeks?" DSMF ¶ 29; PRDSMF ¶ 29. Mr. O'Leary informed Mr. Rubendall that he had been out of work with a broken ankle and Mr. Rubendall replied, "It couldn't have taken you 12 weeks to recover. I broke the same ankle the same way and I was working in two weeks." DSMF ¶ 30; PRDSMF ¶ 30. In fact, Mr. Rubendall had suffered two broken ankles; for one, he was out of work for two months and for the other, he was out for four weeks. DSMF ¶ 31; PRDSMF ¶ 31. Mr. O'Leary thought that Mr. Rubendall was conveying to him that he felt Mr. O'Leary had taken too long to recover from his injury.[8] DSMF ¶ 32; PRDSMF ¶ 32.

_____

[8] Defendant's Statement of Material Fact ¶ 32 states:

> O'Leary understood that Rubendall's statements were an attempt by Rubendall to compare his experience recovering from a broken ankle with O'Leary's recovery experience. O'Leary believed that Rubendall was conveying to O'Leary the fact that Rubendall felt O'Leary had taken too long to recover from a broken ankle.

DSMF ¶ 32. Mr. O'Leary objects, stating that "O'Leary's understanding of the meaning of Mr. Rubdendall's statements is speculation and is irrelevant in any event." PRDSMF ¶ 32. Without waiving his objection, however, Mr. O'Leary admits the statement.

First, as regards the speculation objection, InfraSource cited Mr. O'Leary's own deposition transcript in which he said in part, "[Mr. Rubendall] wanted to know why in the hell it took me so long to get better. And that he broke his ankle and that it only took him a few weeks to get better. So he compared himself - - his injury to my injury." *O'Leary Dep. II* 17:2-5. InfraSource then cited Mr. O'Leary's deposition transcript in which he further testified, "I thought he was trying to say that I took too long to come back from my injury." Neither statement is speculative as to what Mr. O'Laery believed. InfraSource framed its statement in terms of what Mr. O'Leary believed and Mr. O'Leary testified to what he believed at his deposition. As to whether Mr. O'Leary's testimony about what Mr. Rubendall intended is speculative, the Court is satisfied that there is no other reasonable interpretation of Mr. Rubendall's remarks.

Second, regarding the relevance objection, this objection is overruled as well. Mr. O'Leary's understanding of what Mr. Rubendall was conveying to him is obviously relevant. It confirms that from his perspective, for example, Mr. Rubendall was not teasing or kidding him, but was seriously voicing a concern that Mr. O'Leary had taken too long to recover, a concern that may illuminate InfraSource's termination decision. In fact, the Court is mystified as to why Mr. O'Leary is objecting

Mr. O'Leary asked Mr. Rubendall where he wanted to assign him and Mr. Rubendall told him to report to the Princeton worksite the following Monday. DSMF 33; PRDSMF ¶ 33. After speaking briefly with Mr. Smith, Mr. Rubendall called to Mr. O'Leary and told him he did not have any work at Princeton and asked him to call in a few hours to discuss his assignment. DSMF ¶ 35; PRDSMF ¶ 35. A few hours later, Mr. O'Leary spoke to Mr. Rubendall who told him that he had discussed the matter with Mr. Stone and they wanted him to report to the main worksite in Costigan. DSMF ¶ 36; PRDSMF ¶ 36.

Mr. Rubendall estimates that when Mr. O'Leary returned to work on April 9, 2007, the NRI project was 99.5% complete.[9] DSMF ¶ 37; PRDSMF ¶ 37. As of April 19, 2007, InfraSource reported having completed approximately 99.7% of the excavation work on the NRI project. DSMF ¶ 38; PRDSMF ¶ 38.

When Mr. O'Leary returned to work at Costigan and spoke with Mr. Stone, he informed Mr. Stone that his doctor had released him to return to work full duty and that he had given Mr. Smith a note to that effect. DSMF ¶ 39; PRDSMF ¶ 39. Mr. Stone told Mr. O'Leary that he was too busy to speak with him but that after a safety meeting, he would assign Mr. O'Leary a job. DSMF ¶ 39; PRDSMF ¶ 39. At

---

to a statement of material fact that favors his position in the litigation. In any event, the Court treats the statement of material fact as admitted.

[9] Mr. O'Leary objects to this estimate on the ground that there "apparently is a document which, if properly authenticated and a proper foundation were laid, would indicate precisely how much of the work had been done" and therefore Mr. Rubendall's estimate violates the best evidence rule, citing Rule 1002. PRDSMF ¶ 37. Mr. O'Leary then denies the statement. The Court overrules Mr. O'Leary's objection. In general, Rule 1002 requires the original writing to prove the content of a writing. Fed. R. Evid. 1002. Despite Mr. O'Leary's assertion that Mr. Rubendall's estimate must be his recitation of the content of a writing, his estimate appears instead to be his estimate based on his knowledge of the project. *See Def.'s Statement of Material Facts* Ex. C. *Rubendall Dep.* 10:8-17. The Court strikes Mr. O'Leary's denial of Mr. Rubendall's estimate.

the end of the meeting, Mr. O'Leary approached Mr. Stone and Mr. Stone told him that he was going to return him to his former position on the can crew, but he was not sure which can crew to assign him to. DSMF ¶ 40; PRDSMF ¶ 40. Mr. Stone instructed Mr. O'Leary to report to Howard Hollifield in the safety office until a decision was made. DSMF ¶ 40; PRDSMF ¶ 40.

From April 9, 2007 to April 13, 2007, Mr. O'Leary worked for Mr. Hollifield in the safety office or assisted Debbie Greenacre, another InfraSource employee, who worked in the environmental department. DSMF ¶ 41; PRDSMF ¶ 41. Mr. O'Leary was never assigned any specific duties but took it upon himself to dust, take out the trash, clean, rearrange file cabinets, and make spill kits and road signs. DSMF ¶ 41; PRDSMF ¶ 41. During the period from April 9 through April 12, an InfraSource employee, Peter Dumars, the overall Project Manager of the NRI project, or an older white-haired fellow followed Mr. O'Leary whenever he went on lunch breaks or trips to the bathroom, the garbage cans, or his truck. DSMF ¶ 45; PRDSMF ¶ 45. Mr. O'Leary was worried that he would not be reassigned to a crew, but Mr. Hollifield reassured him, told him not to worry, and that there was plenty of work out there, and if Mr. O'Leary needed accommodations, Mr. Holllifield would take care of him. PSAMF ¶ 79; DRPSAMF ¶ 79.

On April 10, 2007, when Mr. O'Leary overheard Mr. Stone and Mr. Rubendall discussing retooling the crews and sending them out to new jobs, Mr. O'Leary asked them when he was going to be assigned work. DSMF ¶ 42; PRDSMF ¶ 42. Mr. Rubendall brushed up against Mr. O'Leary with his shoulder and told him that he

was "a walking accident" and that he was not "going any place but right here." DSMF ¶ 42; PRDSMF ¶ 42. Mr. O'Leary felt that Mr. Rubendall was acting overbearing and intimidating, and thought that Mr. Rubendall's comment meant that he was afraid Mr. O'Leary would reinjure himself if he continued to work on a can crew.[10] DSMF ¶ 43; PRDSMF ¶ 43. Mr. O'Leary followed Mr. Rubendall out of the office and found Mr. Stone. DSMF ¶ 44; PRDSMF ¶ 44. Mr. O'Leary told Mr.

---

[10] Defendant's Statement of Material Fact ¶ 43 states:

> O'Leary felt that Rubendall was acting overbearing and intimidating, and that Rubendall's comment indicated that Rubendall was afraid that O'Leary would reinjure himself if he continue[d] to work on a "can crew."

DSMF ¶ 43.

Mr. O'Leary objected on the ground that "Mr. O'Leary's understanding of the meaning of Mr. Rubendall's statements is speculation and is irrelevant in any event." PRDSMF ¶ 43. Defendant's Statement of Material Fact ¶ 43 is contained in Mr. O'Leary's own deposition. Mr. O'Leary testified:

> Q. So, you say he brushed you.
> A. Yes.
> Q. What do you mean he brushed you? Like, a hairbrush?
> A. No. He brushed me with his shoulder as he walked by me.
> Q. Like leaning into you to brush you?
> A. Yes.
> Q. Was he laughing when he said it? Like, as joke, jest brush?
> A. No. He was loud. He's loud. He's a loud person. Very overbearing. And he's tall. He's twice as tall as I am, which don't take much to be taller than me. Yes. It was very intimidating when he brushed by me.

*Dep. of O'Leary* at 138:23-25; 139:1-9. Mr. O'Leary also testified:

> Q. So you took it to mean - - and correct me if I'm wrong - - when he said, you're a walking accident, you took it to mean that he was afraid that you were going to reinjure yourself if you went out on, like, a can crew or something like that?
> A. That's correct.

*Id.* 139:20-15. There is no need to speculate about whether Mr. O'Leary thought Mr. Rubendall was acting "overbearing" and "intimidating". Those are Mr. O'Leary's own adjectives. Further there is no need to speculate about whether Mr. O'Leary thought that Mr. Rubendall was afraid he would reinjure himself if he continued to work on the can crew. Again, that is what Mr. O'Leary testified. Mr. O'Leary's impressions of Mr. Rubendall are also relevant.

Again, it is difficult to understand why Mr. O'Leary is objecting to this statement of material fact since it appears to favor his side of the case. In any event, the Court overrules Mr. O'Leary's objections for the reasons set forth in footnote 8 above.

Stone that Ms. Greenacre had told him she had all kinds of work for him in the environmental department, but Mr. Stone responded that he did not need Mr. O'Leary working for Ms. Greenacre.  DSMF ¶ 44; PRDSMF ¶ 44.

Mr. O'Leary's last day of work for InfraSource was April 13, 2007.  DSMF ¶ 46; PRDSMF ¶ 46.  When Mr. O'Leary reported to work that morning, Mr. Rubendall came into the safety office and said "you're out of here."  DSMF ¶ 46; PRDSMF ¶ 46.  Mr. O'Leary asked what he meant and Mr. Rubendall replied that "they did not need him anymore."  DSMF ¶ 46; PRDSMF ¶ 46.  Mr. O'Leary asked Mr. Rubendall if they could talk outside the office because there were other employees there and they stepped outside the office.  DSMF ¶ 46; PRDSMF ¶ 46.  Mr. O'Leary asked Mr. Rubendall for a "slip" that he could take to "the unemployment office."  DSMF ¶ 46; PRDSMF ¶ 46.  Mr. Rubendall left briefly and returned with a document titled EMPLOYMENT TERMINATION FORM.  DSMF ¶ 46; PRDSMF ¶ 46.  Mr. O'Leary asked Mr. Rubendall if he was sure that this was the decision he wanted to make and Mr. Rubendall replied that "it was unfortunate that you had to break you ankle and [be] out of work so long, but we no longer need you." DSMF ¶ 47; PRDSMF ¶ 47.  Mr. O'Leary took the EMPLOYMENT TERMINATION from Mr. Rubendall and drove away.  DSMF ¶ 47; PRDSMF ¶ 47.  Mr. O'Leary was the only InfraSource employee who was terminated that day. PSAMF ¶ 108; DRPSAMF ¶ 108.

The evening of April 13, 2007, Jeff Sibley, who was Mr. O'Leary's former father-in-law, contacted Mr. O'Leary and wanted to know why he had been fired.

PSAMF ¶ 87; DRPSAMF ¶ 87. Mr. Sibley sounded angry. PSAMF ¶ 87; DRPSAMF ¶ 87. He said that he was going to go into someone's office and get to the bottom of it, find out what happened, and get Mr. O'Leary back on his crew as a rehire. PSAMF ¶ 87; DRPSAMF ¶ 87. Mr. O'Leary told Mr. Sibley that he should probably stay out of it and not get involved. PSAMF ¶ 88; DRPSAMF ¶ 88.

In May 2007, Mr. O'Leary was driving on the Stud Mill Road when he was hit by an InfraSource truck driven by Chris Irish. PSAMF ¶ 91; DRPSAMF ¶ 91. After the accident, they decided to drive to the Costigan shop because the truck that Mr. O'Leary had been driving was emitting steam from under the hood. PSAMF ¶ 92; DRPSAMF ¶ 92. On the way to Costigan, Mr. Irish apologized for the accident and asked if Mr. O'Leary would take cash and not report the accident, but Mr. O'Leary declined the offer, observing that it was Christie[11] Murray's truck. PSAMF ¶ 93-94; DRPSAMF ¶ 93-94. When they arrived at the Costigan shop, they met Mr. Stone and Adam Smith. PSAMF ¶ 95; DRPSAMF ¶ 95. Adam Smith gave Mr. O'Leary the runaround and refused to give him InfraSource's insurance information. PSAMF ¶ 96; DRPSAMF ¶ 96. The next day, Ms. Murray and Mr. O'Leary went to the Costigan yard and encountered W.D. Guess, who remarked: "Boys, I thought we already got rid of you." PSAMF ¶ 97; DRPSAMF ¶ 97. Mr. Guess gave Ms. Murray the runaround and would not disclose InfraSource's insurance information. PSAMF ¶ 98; DRPSAMF ¶ 98. Ms. Murray eventually got InfraSource's insurance information but only after contacting the Sheriff's Department. PSAMF ¶ 98;

---

[11] Ms. Murray's first name is also spelled Kristi in the record. *Compare* PSAMF ¶ 94 *with* PSAMF Attach 4 (*O'Leary Dep. 1*).

DRPSAMF ¶ 98. As a result of the sheriff's investigation, Mr. O'Leary learned that Mr. Irish did not have a driver's license.[12] PSAMF ¶ 99; DRPSAMF ¶ 99. Mr. Irish was the employee who replaced Mr. O'Leary on the can crew and he was still working there as of the May 2007 accident. PSAMF ¶ 100; DRPSAMF ¶ 100. Mr. O'Leary saw employees working on the InfraSource job until October or November 2007. PSAMF ¶ 101; DRPSAMF ¶ 101. Mr. O'Leary underwent surgery on October 12, 2007 to remove the plates and screws in his ankle and to this day, he remains under work restrictions as a result of the ankle injury. PSAMF ¶ 113; DRPSAMF ¶ 113.

### C. Infrasource's Contentions

#### 1. The pre-June 21, 2007 version of the MHRA

First, InfraSource clarifies the version of the MHRA that it contends controls Mr. O'Leary's case. Observing that the Maine Legislature amended the MHRA effective June 21, 2007, InfraSource says that the version of the MHRA that was in effect as of April 13, 2007, the date it terminated him, not the amended version of the MHRA, controls. *Def.'s Mot.* at 5. Specifically, InfraSource states that the applicable definition of "disability" is the April 2007 definition, not the June 2007 definition. *Id.* (citing 5 M.R.S. § 4553(7-A), (7-B) (*repealed* Jun. 21, 2007)). To prove

---

[12] The parties have quarreled over whether the assertion that Mr. Irish did not have a driver's license is admissible evidence. InfraSource moved to strike pursuant to Local Rule 56(e) based on its view that Mr. O'Leary's statements about what Mr. Irish told him are hearsay since they are offered for the truth of the matter. DRPSAMF ¶ 99-100; D. Me Loc. R. 56(e). Mr. O'Leary responded that they are admissible under Rule 803(8) as a public record. *Pl.'s Resp. to Def.'s Evidentiary Objections to his Statement of Additional Material Facts* at 1 (Docket # 45). The Court does not treat Mr. Irish's statements to Mr. O'Leary about his driver's license as being submitted for the truth of the matter but rather as an explanation for why InfraSource responded as it did. InfraSource's motion to strike is DENIED.

a MHRA discrimination claim under the April 2007 version of the law, InfraSource says that Mr. O'Leary must prove one of three things: 1) that he had a physical or mental disability; 2) that he had a record of a physical or mental disability; or, 3) that he was regarded as having a physical or mental disability. *Id.* at 6 (citing 5 M.R.S. § 4553(7-B) (*repealed* Jun. 21, 2007).

### 2. The MHRA definition of disability

#### a. Physical or mental disability

Regarding the first criterion, InfraSource contends that Mr. O'Leary has not claimed that he had a physical or mental disability within the meaning of the MHRA.

#### b. "Record of" disability

Drawing on the pre-June 21, 2007 definition of "disability," InfraSource claims that "Mr. O'Leary must prove that he has a history or has been misclassified as having, one of the three categories of covered conditions set forth in 5 M.R.S. § 4553(7-A)." *Id.* at 14. Observing that Mr. O'Leary's Complaint "does not disclose which documents or records he contends [were] part of his 'record' of a disability," InfraSource assumes that Mr. O'Leary is pointing to a "Practitioner's Report" and doctor's note, indicating that Mr. O'Leary could return to work on regular duty on April 9, 2007. *Id.* InfraSource contends that "these documents do not establish that Mr. O'Leary had a history, or has been misclassified as having a condition covered by Section 4553(7-A)." *Id.* To the contrary, Infrasource argues these documents establish that he did not. *Id.* at 15.

### c. "Regarded as" disabled

Turning to the "regarded as" criterion, InfraSource notes that the definition of "disability" is the pre-June 21, 2007 definition, and it argues that Mr. O'Leary failed to raise a genuine issue as to any material fact about whether InfraSource regarded Mr. O'Leary as having a disability. *Def.'s Mot.* at 7-9. InfraSource acknowledges that Mr. O'Leary alleges that, upon his return to work after his ankle injury, Mr. Rubendall asked him "Where in the the hell [have you] been?" and "Why have [you] been out of work for 12 weeks?" *Id.* at 10. After Mr. O'Leary explained where he had been, Mr. Rubendall replied, "It couldn't have taken you 12 weeks to recover. I broke the same ankle the same way and I was working in two weeks." *Id.* InfraSource contends that "[e]ven assuming [Mr.] O'Leary's recollection of [Mr.] Rubendall's statements is accurate, the statements do not prove that [Mr.] Rubendall regarded [Mr.] O'Leary as being disabled." *Id.* at 8-9. InfraSource stresses that Mr. Rubendall was merely comparing recovery dates. *Id.* at 10.

InfraSource turns to the second statement attributed to Mr. Rubendall. Mr. O'Leary claims this statement was made on April 10, 2007, the day after Mr. O'Leary returned to work. *Id.* at 11. Mr. O'Leary approached Mr. Rubendall and Howard Hollifield, Mr. O'Leary's supervisor, and asked them where he was going to be assigned for work. *Id.* at 12. "[Mr.] Rubendall brushed up against [Mr.] O'Leary's shoulder and told [Mr.] O'Leary that he was 'a walking accident' and that he was not 'going any place but right here.' *Id.* Even assuming Mr. O'Leary's recollection of this conversation is correct, InfraSource says that Mr. Rubendall's

"statements do not indicate that [Mr.] Rubendall, or anyone else associated with InfraSource, regarded Mr. O'Leary as being disabled." *Id.* At most, InfraSource says, the statements suggest that Mr. Rubendall thought of Mr. O'Leary as "clumsy, inattentive or even accident-prone." *Id.*

InfraSource addresses Mr. O'Leary's assertion that during his last week of employment with InfraSource, he was "watched." *Id.* at 13. Mr. O'Leary says he was constantly followed around by a man named Peter Dumars or another "older white-headed fellow." *Id.* This close monitoring took place whenever he left the office and extended to his trips to the bathroom, his lunch break, and other activity. *Id.* InfraSource asserts that even if Mr. O'Leary was being watched, this does not mean he was being watched because he was regarded as disabled. *Id.* In fact, InfraSource says that Mr. O'Leary himself thought that they were watching him because "they were waiting for me to fall down again and reinjure my ankle, so they wanted to keep a close eye on me." *Id.*

### 3. Legitimate non-discriminatory reason for laying off

InfraSource insists that it had a legitimate, non-discriminatory reason for laying off Mr. O'Leary. *Id.* at 16. It says that, by the time Mr. O'Leary returned to work in April, 2007, the excavation phase of the NRI project was virtually finished and that it had begun to lay off employees for this phase of the work. *Id.* at 16-17. InfraSource claims that after assigning Mr. O'Leary to the operations yard in Costigan for four days, it concluded it did not have work available for him and laid him off for that reason. *Id.* at 17.

### 4. Pretextual reason for lay-off

InfraSource says that Mr. O'Leary will not be able to establish that its decision to lay off Mr. O'Leary was a pretext for disability discrimination. *Id.* at 17-19. InfraSouce claims that Mr. O'Leary is relying on "statements by a few of his former co-workers that they wanted to have him to work on their 'can crews'" and his overhearing a general "going on out in the field" reference. *Id.* at 18-19. InfraSource asserts that the timing and substance of these comments are insufficient to raise a genuine issue of material fact about whether his layoff was pretextual.

### 5. Punitive damages

Finally, noting that the MHRA standard for the imposition of punitive damages is "with malice or with reckless indifference" to the plaintiff's rights and that the plaintiff is required to prove entitlement to punitive damages by clear and convincing evidence, InfraSource asserts that Mr. O'Leary "cannot meet his burden of proving that InfraSource engaged in discriminatory conduct in the face of a perceived risk (i.e., almost certainly knowing) that it violated the law." *Id.* at 20.

### D. Randy O'Leary's Response

### 1. The pre-June 21, 2007 version of the MHRA

Mr. O'Leary agrees that his "claim is governed by the pre-2007 version of the definition of 'disability' under Maine law." *Pl.'s Opp'n* at 8 n.3. He also affirms that "he is not claiming an actual disability, but rather is proceeding under the 'regarded as' and/or 'record of' portions of the applicable definition of disability." *Id.*

### 2.    "Record of" disability

Quoting former 29 C.F.R. § 1630.2(k), Mr. O'Leary defines "record of disability":

> Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

*Id.* at 15.    Mr. O'Leary agrees that because the repealed version of the MHRA definition of disability is effective for this case, the "focus is not on substantially limiting one or more major life activities but on whether Mr. O'Leary had a history of an infirmity which was caused by bodily injury or accident." *Id.*    Mr. O'Leary claims that his fractured ankle, which required surgery and which was caused by a bodily injury or accident, fits within this definition. *Id.*    Mr. O'Leary rejects InfraSource's contention that he "must prove precisely what documents make up the 'record' of his disability," stating that a "record" of disability "means a history of disability, not a document demonstrating that disability." *Id.* at 16.    Mr. O'Leary says that the cumulative evidence in this case is sufficient to allow a jury to conclude that InfraSource was aware of his disability. *Id.*

### 3.    "Regarded As" Disabled

Urging the Court to look at the "complete picture," Mr. O'Leary argues that there is a genuine issue of fact as to whether Infrasource regarded him as disabled. *Id.* at 8.    Mr. O'Leary starts with his back injury in November 2006, which caused him to be out of work for two weeks. *Id.* at 9.    Mr. O'Leary asserts that InfraSource responded to that injury in "a negative manner" by "offering to pay Mr. O'Leary

straight salary for two weeks if he would refrain from filing a workers' compensation claim and submit the bills to his health insurer or pay them out of pocket instead." *Id.*

Next, on January 10, 2007, when Mr. O'Leary injured his ankle, InfraSource "did not encourage him to seek medical attention, but rather told him to elevate, ice and soak his ankle instead." *Id.* Also, when Mr. O'Leary called InfraSource to tell them his ankle was no better, Mr. O'Leary says that Alana at InfraSource "told him not to go to a doctor until someone at InfraSource called him back; however, no one ever did call him back that day." *Id.* Further, after Mr. O'Leary underwent surgery, he continued to contact InfraSource to update them about his progress, a fact that is corroborated by his phone records but that InfraSource denies. *Id.* Mr. O'Leary disputes InfraSource's charge that he neglected to keep them informed. *Id.* at 9-10.

Mr. O'Leary contends that while he was recovering from surgery, Joe Stone of InfraSource "showed up at his house demanding to know when he was returning to work, and insisting that he should have been back already." *Id.* at 10. "Mr. Stone insisted that Mr. O'Leary report to [InfraSource] that same day, and Mr. O'Leary in fact did so." *Id.* While there, Mr. Smith claimed that he had not been receiving medical progress reports, a claim Mr. O'Leary asserts was "clearly untrue" because he "could see a portion of his medical reports on Mr. Smith's computer screen." *Id.*

On April 6, 2007, Mr. O'Leary brought a doctor's note to InfraSource informing it that he could return to work on April 9 with no restrictions. *Id.* Adam

Smith informed Mr. O'Leary that he had asked Joe Stone where to assign Mr. O'Leary, but Mr. Stone had not responded. *Id.* Consequently, Mr. Smith sought out Mr. Rubendall, who asked when seeing Mr. O'Leary, "Where the hell" he had been. *Id.* at 10-11. Mr. Rubendall expressed disbelief that it had taken Mr. O'Leary so long to heal from a broken ankle. *Id.* at 11. Mr. Rubendall told Mr. O'Leary to report the following Monday to the Princeton work site, but as Mr. O'Leary began to leave, Mr. Rubendall consulted with Adam Smith, who had followed Mr. O'Leary's medical treatment, and Mr. Rubendall suddenly changed his mind. *Id.* Instead, he told Mr. O'Leary to call in for assignment. Mr. O'Leary did so and was told to report to the Costigan job site. *Id.*

When Mr. O'Leary returned to work on April 9, 2007, InfraSource did not assign him any tasks at all and kept him in an office. *Id.* Mr. O'Leary searched out work to do and asked Mr. Rubendall when he was going to be assigned to a crew. *Id.* Mr. Rubendall replied that Mr. O'Leary was a "walking accident" and was "not going any place but right here." *Id.* For the remainder of the week, each time Mr. O'Leary left the office, he was followed and on April 13, 2007, InfraSource terminated Mr. O'Leary. *Id.*

Mr. O'Leary contends that this cumulative evidence is "more than sufficient for a jury to conclude that InfraSource refused to put Mr. O'Leary back to work because it regarded him as disabled." *Id.* Citing former 29 C.F.R. § 1630.2(1), Mr. O'Leary claims that even though he "may have [had] an impairment which [was]

not substantially limiting," his condition was "perceived by the employer . . . as constituting a substantially limiting impairment." *Id.* at 12.

### E. InfraSource's Reply

In its reply, InfraSource says that W.D. Guess of InfraSource had not interfered with Mr. O'Leary's rights under the Workers' Compensation Act. *Def.'s Reply* at 1. To the contrary, after InfraSource's workers' compensation carrier denied his claim for work-related benefits, Mr. Guess offered him two weeks of paid leave. *Id.* at 1-2. Further, InfraSource points out that whatever Mr. Guess did in 2006 had no connection with Mr. O'Leary's layoff in April 2007. *Id.* at 2.

In a similar vein, InfraSource points out the Mr. Smith's suggestion on January 11, 2007 that Mr. O'Leary elevate, ice, and soak his ankle was the same advice that Mr. O'Leary's own mother, who was a nurse, gave him. *Id.* Further, InfraSource again contends there is no evidence of a causal connection between Mr. Smith's advice on January 11, 2007 and how InfraSource managers viewed him in April 2007. InfraSource concedes that Mr. O'Leary maintained regular contact with it during his January to April absence but says that his regular contact "has no relevance to the question of whether O'Leary was regarded as disabled." *Id.* Citing *Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 101 (1st Cir. 2002), InfraSource dismisses Mr. Rubendall's statements as "isolated, stray remarks by a non-decision maker." *Id.* at 3-4. Further, they contend that Mr. Rubendall's statement that Mr. O'Leary was a "walking accident" does not evince a belief that Mr. O'Leary was

physically unable to return to work, but only that he was "accident prone or clumsy." *Id.* at 4.

Turning to the "record of" disability issue, InfraSource discounts Mr. O'Leary's response as too simplistic. *Id.* at 5. InfraSource stresses the Maine Human Rights Act regulations that contain an express definition of "infirmity." *Id.* (quoting 11 C.M.R. 94-348, § 3.02(C)(2) (2006)). InfraSource contends that the Maine Human Rights Commission regulations expressly exclude any "transitory and minor" conditions. *Id.* Finally, InfraSource observes that Mr. O'Leary failed to demonstrate that Mr. Stone and Mr. DeMarsh were aware of his "record of" disability when they laid him off. *Id.* at 6.

Regarding the pretextual argument, InfraSource maintains that Mr. O'Leary failed to present sufficient evidence from which a factfinder could conclude that the reasons for his layoff were pretextual. Id. at 6-7. Finally, it argues that Mr. O'Leary "does not, and cannot, offer any evidence to support a finding of malice or reckless indifference." *Id.* at 7-8.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the

suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (citation and internal quotation marks omitted).

### B.  Applicable Law

The parties agree that the version of the MRHA applicable to Mr. O'Leary's cause of action is the pre-June 21, 2007 version. The Court is not so certain. It is true that in *Rooney v. Sprague Energy Corp.*, 519 F. Supp 2d 131, 135 (D. Me. 2007), the Court concluded that the June 21, 2007 amendment to the MHRA was not retroactive, stating that "[t]here is no expression of legislative intent to apply the new definition retroactively." But the Maine retroactivity law is generally triggered by the date the proceeding was filed, not the date of the incident that brought about the complaint. Section 302 of title 1 of the Maine Revised Statutes provides that:

> Actions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not affected thereby.

1 M.R.S. ¶ 302. Mr. O'Leary's cause of action was not "pending at the time of the passage" since the amendment was effective on June 21, 2007 and he filed his cause of action in state court on April 2, 2009. *Notice of Removal* ¶ 1 (Docket # 1). There are certain limited restraints against retroactive application of a statute enacted subsequent to an event. *See Reagan v. Racal Mortg., Inc.*, 1998 ME 188, 715 A.2d 925. But they do not apply here.

It probably does not matter. "One major difference between these two definitions is that under the old law as interpreted in *Whitney*[13], the plaintiff is not required to demonstrate that he is substantially limited in a major life activity; whereas, under the new law, the substantially limits language is incorporated in the statutory standard." *Rooney*, 519 F. Supp. 2d at 134. Nevertheless, as in *Rooney*, the Court is not certain that "the distinction between these two definitions makes any practical difference." *Id.* at 134 n.3. In *Whitney*, the Maine Supreme Judicial Court interpreted the MHRA as not including the requirement that the plaintiff have a disability that constitutes a "substantial limitation on a major life activity," but it did not eliminate the disability requirement altogether. *Whitney*, 2006 ME ¶¶ 30-31, 895 A.2d at 316.

Here, Mr. O'Leary "is not claiming an actual disability, but rather is proceeding under the 'regarded as' and/or 'record of' portions of the applicable definition of disability." *Pl.'s Opp'n* at 8 n.3. It is possible but doubtful that the definition of disability could impact the edges of Mr. O'Leary's cause of action since whether he was regarded as having a disability, whether he had a record of a disability, and whether he was terminated because of that disability call into play the definition of disability. At the same time, from January 10, 2007, when he broke his ankle, to April 9, 2007, when he returned to work, Mr. O'Leary was substantially restricted in the level of his physical activity by his surgeon and for purposes of the issues in this motion, the Court assumes his level of disability would

---

[13] The Maine Legislature enacted the June 21, 2007 amendment in response to the Maine Supreme Judicial Court's decision in *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, 895 A.2d 309.

satisfy either definition. *See Bailey v. Georgia-Pac. Corp.*, 306 F.3d 1162, 1168 (1st Cir. 2002) (observing that under 29 C.F.R. § 1630.2, "working" is a major life activity).

### C.     "Record of" Disability

In *Bailey*, the First Circuit described the purpose of the analogous "record of" provision in the Americans with Disabilities Act: "The purpose of this provision is largely to protect those who have recovered or are recovering from substantially limiting impairments from discrimination based on their medical history." 306 F.3d at 1169. To qualify, Mr. O'Leary must prove that he has a history of, or has been misclassified as having, an impairment that substantially limited a major life activity. *Id.*

InfraSource's first argument – that Mr. O'Leary's medical documents do not reveal that he was disabled after he returned to full duty following his ankle fracture – is a non-starter. As the First Circuit has explained, the "record of" provision is to protect those "who have recovered" from impairments "based on their medical history." *Id.* The fact that Mr. O'Leary returned to work without restrictions does not mean that InfraSource was free to fire him because he had sustained a serious injury from which he had fully recovered. *See* 9 Lex K. Larson, EMPLOYMENT DISCRIMINATION 9-153 § 153.08 (stating that "persons who have recovered from impairments . . . are still protected against discrimination based on their medical history . . . .") (ed. 2010); *Julien v. Louisana*, Civil Action No. 94-3277 Section "R", 1995 U.S. Dist. LEXIS 3424 *2 (E.D. La. Mar. 10, 1995) (stating that

"[t]he ADA clearly contemplates protecting workers from discrimination if they have a record of a physical or mental impairment or are regarded as having an impairment, irrespective of whether they are, in fact, disabled"). Thus, although it is true that temporary conditions are usually not covered by the ADA's definition of disability, so long as the condition met the definition of disability, the "record of" prong of disability discrimination extends to disabling conditions from which the employee has recovered.

InfraSource's second contention is that the medical records "do not demonstrate that [Mr.] O'Leary's doctor determine that [Mr.] O'Leary had a 'physical or mental condition . . . that constitutes a substantial disability." *Def.'s Mot.* at 15. This is incorrect for two reasons. First, as the First Circuit stated in *Bailey*, working is a major life activity and Mr. O'Leary's physician had restricted him from working for approximately three months. *Bailey*, 306 F.3d at 1168. Second, Mr. O'Leary had undergone surgery and the Supreme Court has categorized an impairment that was "serious enough to require hospitalization" as an impairment that substantially limits one or more major life activities and that the employee's hospitalization "demonstrates that she has a record of physical impairment." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 281 (1987).

It is true, as InfraSource says, that there is no evidence that Mr. O'Leary's physical impairment "requires special education, vocational rehabilitation or related services", 5 M.R.S. § 4552(7-A) (repealed June 21, 2007); 5 M.R.S. § 4553-A(1)(A)(3), but these definitions of disability are in the alternative.

In short, the Court agrees with Mr. O'Leary that "InfraSource knew, via oral reports from Mr. O'Leary, Adam Smith's attendance at Mr. O'Leary's doctor and hospital visits, and Mr. Smith's review of Mr. O'Leary's medical records, that Mr. O'Leary had a fractured ankle which had required surgery to install screws and plates to hold the bones in place while it healed. InfraSource also knew that this injury had kept him out of the work force for one day less than three months (January 10, 2007 through April 9, 2007). That knowledge is sufficient for a jury to find that InfraSource knew of Mr. O'Leary's 'record of' disability." *Pl.'s Opp'n* at 16.

## D. "Regarded As"

In *Ruiz Rivera v. Pfizer Pharmaceuticals., LLC*, 521 F.3d 76, 82-83 (1st Cir. 2008), the First Circuit explained "regarded as" discrimination under the ADA:

> The regarded as prong of the ADA exists to cover those cases "in which 'myths, fears and stereotypes' affect the employer's treatment of an individual," *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000) (quoting 29 C.F.R. § 1630.2(l), because Congress has recognized that "society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110, 117 (1st Cir. 2004) (citations omitted).

The First Circuit in *Ruiz Rivera* explained that "[r]egarded as claims primarily fall into one of two categories: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Id.* at 83 (punctuation and citation omitted). "A plaintiff claiming that he is 'regarded' as disabled cannot merely show that his employer perceived him as *somehow* disabled; rather, he must

prove that the employer regard him as disabled *within the meaning of the ADA*." *Id* (citations and internal quotation omitted).

InfraSource addresses Mr. Rubendall's statements to Mr. O'Leary expressing skepticism about what Mr. Rubendall thought was Mr. O'Leary's inexplicably slow recovery from a broken ankle, his description of Mr. O'Leary as a "walking accident," and Mr. O'Leary's perception that he was being followed around the worksite. *Def.'s Mot.* at 9-12. InfraSource contends that Mr. Rubendall's statements, if true, are insufficient to establish that Mr. Rubendall considered Mr. O'leary disabled within the meaning of the MHRA. *Id.* It further contends that even if Mr. O'Leary was being followed, it was not because he was disabled but because he was accident prone. *Id.* at 13.

The Court disagrees. Mr. Rubendall's comments to Mr. O'Leary were made in the context of his prolonged absence from work in the case of the slow recovery comment or his inability to perform his work without getting injured in the case of the walking accident comment. Both are therefore directly related to the MHRA definition of disability: either being rendered unable to work – i.e. taking twelve weeks to recover from an injury that the average person would have recovered from in a couple of weeks – or being unable to perform certain types of jobs because of being accident prone as demonstrated by his fractured ankle. Similarly, assuming InfraSource trailed Mr. O'Leary after he returned to work, it may have been in part because he took so long to recover from a broken ankle. Mr. Rubendall's comments

and InfraSource's actions fit within the *Ruiz River* Court's description of a plaintiff's burden when the major life activity is working:

> When "working" is the major life activity at issue, a plaintiff must demonstrate not only that the employer thought that he was impaired in his ability to do the job that he held, but also that the employer regarded him as substantially impaired in either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities.

*Ruiz Rivera*, 521 F.3d at 83 (punctuation and citation omitted).

In short, Mr. O'Leary has at least raised a genuine issue of fact as to whether because he broke his ankle and because his broken ankle took longer to heal than Mr. Rubendall's, Mr. Rubendall and InfraSource regarded him as being an accident prone, spleeny slacker, who should not be sent out on certain jobs because he would get hurt and then stay out longer than he should. As for purposes of this motion, there is no evidence that Mr. Rubendall's and InfraSource's perceptions of Mr. O'Leary were correct; instead they were arguably based on stereotyping of Mr. O'Leary. This is sufficient to survive summary judgment.

In its Reply, InfraSource raised a new issue: that Mr. Rubendall "did not make, and was not involved in, the decision to lay O'Leary off." *Def.'s Reply* at 3. But, according to the record, Mr. Rubendall was the Head Foundation Superintendent for InfraSource and was the superintendent who initially assigned him back to the can crew and then retracted the assignment. Moreover, it was Mr. Rubendall who came into the safety office and fired Mr. O'Leary, informing him "you're out of here" and explaining that it was unfortunate that he had broken his ankle and had to be out of work for so long, but InfraSource no longer needed him.

DSMF ¶ 46; PRDSMF ¶ 46.  Viewing the evidence in the light most favorable to Mr. O'Leary, a reasonable factfinder could conclude that Mr. Rubendall was involved in the decision to terminate Mr. O'Leary.

InfraSource raised another new issue in its Reply:  that Mr. Rubendall's remarks were merely "stray remarks" insufficient to prove discriminatory animus. While it is correct that some remarks can be considered "mere background noise" or "stray remarks", *see Ruiz Rivera*, 521 F.3d at 87, here Mr. Rubendall echoed his allegedly "stray remark" when he terminated Mr. O'Leary, telling him that it was too unfortunate he had broken his ankle and stayed out of work for so long.  Thus, the "stray remark" – "Where the hell have you been?" – became InfraSource's explanation for the dismissal.

Mr. O'Leary has produced sufficient evidence to allow a factfinder to resolve whether InfraSource regarded him as being disabled.

### E.    Legitimate Nondiscriminatory Reason for Action

Once Mr. O'Leary has produced sufficient evidence to survive summary judgment on his prima facie case, the law requires InfraSource to proffer a legitimate nondiscriminatory reason for its termination.  *Mcdonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 9, 974 A.2d 276, 280.  Here, InfraSource has offered such a reason:  the NRI project was over and InfraSource no longer required his services.  The Court agrees with InfraSource that its proffered explanation satisfies its burden of production.

**F.     Pretext**

Under *McDonnell Douglas*, the burden shifts back to Mr. O'Leary to produce evidence from which a jury could conclude that InfraSource's proffered reason is a pretext and the true reason is unlawful discrimination. *Cookson*, 2009 ME ¶ 14, 974 A.2d at 281.   On this issue, Mr. O'Leary bears the "ultimate burden of persuasion." *Id.*  In his response, Mr. O'Leary lists fourteen facts that he contends, when taken together, raise a genuine issue of material fact as to whether he is able to sustain his burden of persuasion. *Pl.'s Opp'n* at 18-19.  Without reciting each piece of evidence, the Court agrees with Mr. O'Leary that hearing that evidence, a reasonable jury could find that InfraSource's explanation is pretextual. InfraSource's contentions to the contrary are bottomed on factual issues, which a jury could resolve against InfraSource.

**G.     Punitive Damages**

Under the MRHA, a plaintiff may recover punitive damages only if he demonstrates that the defendant engaged in a discriminatory practice "with malice or with reckless indifference" to the plaintiff's rights.  5 M.R.S. § 4613(2)(B)(8)(c) (stating that "[a] complaining party may recover punitive damages . . . against a respondent if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the rights of an aggrieved individual protected by this Act").  Mr. O'Leary must prove malice or implied malice by clear and convincing evidence. *Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶ 13, 914 A.2d 1116, 1121-

22; *Morin v. Eastern Me. Med. Ctr.*, CV-09-258-B-W, 2010 U.S. Dist. LEXIS 109689 *16 (D. Me. Oct. 12, 2010); *Roussel v. St. Joseph Hosp.*, 257 F. Supp. 2d 280, 287 (D. Me. 2003).

InfraSource contends that the evidence in this case is insufficient to raise a jury question about whether it acted with malice or reckless indifference. *Def.'s Reply* at 7. Mr. O'Leary responds that InfraSource's treatment and termination of Mr. O'Leary following his ankle injury is consistent with its treatment of him following his back injury. *Pl.'s Opp'n.* at 20-22. He claims that InfraSource has been motivated by its concern about its workers' compensation costs. *Id.* Citing *Quint v. A.E. Staley Mfg., Co.*, 172 F.3d 1 (1st Cir. 1999), Mr. O'Leary says that a violation of his Maine Workers' Compensation Act rights based on his MHRA protections can amount to reckless indifference of his MHRA rights. 172 F.3d at 14. InfraSource replies that because Mr. Stone and Mr. DeMarsh were the actual decisionmakers concerning Mr. O'Leary's termination, Mr. O'Leary's earlier workers' compensation dealings with non-decisionmakers do not support a punitive damages claim. *Def.'s Reply* at 7.

The Court agrees with Mr. O'Leary. Here, taken in the light most favorable to Mr. O'Leary, the Court concludes that he has raised sufficient evidence to create a jury question as to whether InfraSource's actions were done with malice or with reckless indifference to his rights under the MHRA.

### H.     Summary

Although at trial InfraSource may be able to convince a jury that its side of the events compels a verdict in its favor, its motion for summary judgment, when analyzed, amounts to an argument on facts, not on law, and those facts at this stage must be viewed in Mr. O'Leary's favor.

One example is who within InfraSource had the authority to terminate Mr. O'Leary.  InfraSource insists that Mr. Rubendall, the man who did the actual firing, had nothing to do with the decision to terminate.  Assuming this contested fact to be true, InfraSource demands summary judgment.

But on this record, whether Mr. Rubendall was involved in Mr. O'Leary's termination is a factual issue.  Mr. Rubendall was not a functionary within the company; he was the Head Foundation Superintendent for the NRI project with overall oversight over the division where Mr. O'Leary worked.  When Mr. O'Leary returned to work on April 9, 2007, Mr. Stone, a man InfraSource concedes was involved in the termination decision, referred Mr. O'Leary to Mr. Rubendall for job assignment and it was Mr. Rubendall who compared his own broken ankle to Mr. O'Leary's and expressed frustration with the length of time Mr. O'Leary had been out of work.  It was Mr. Rubendall who spoke to Adam Smith and then cancelled Mr. O'Leary's assignment to Princeton, and it was Mr. Rubendall who then spoke to Mr. Stone and then told Mr. O'Leary that his assignment was changed to the safety office at Costigan.  Later, when Mr. O'Leary asked Mr. Stone and Mr. Rubendall for an assignment, it was Mr. Rubendall who responded to Mr. O'Leary's request for

assignment by calling him a walking accident and telling him he was not going any place but right here.  Finally, it was Mr. Rubendall who did the actual firing and told him that the reason for the termination was his ankle injury and the length of time he had taken to recover.  With this backdrop, InfraSource's insistence that Mr. Rubendall did not influence or make the decision to terminate Mr. O'Leary does not foreclose a factual issue about Mr. Rubendall's actual involvement in Mr. O'Leary's termination.

But even if Mr. Stone's involvement is similarly isolated, there is still a genuine issue of material fact.  Mr. Stone was the person who came pounding on Mr. O'Leary's door in the middle of his recovery from surgery, who demanded to know why he had failed to maintain contact with Adam Smith, and who attempted in Mr. O'Leary's view to bully him back to work.  It was Mr. Stone who did not have time to assign Mr. O'Leary to a job when he did return to work, who assigned Mr. O'Leary to the make-work position in the safety office, who assigned other workers back to crews but not Mr. O'Leary, and who refused to assign Mr. O'Leary to Ms. Greenacre's crew.  A jury could readily find that this combination of evidence demonstrates that Mr. Stone, InfraSource's decisionmaker, was upset with Mr. O'Leary because he had broken his ankle, was irritated at the length of the recovery process, and resolved to fire him upon his return to InfraSource.

A similar analysis could be done on all of InfraSource's issues leading to the inevitable conclusion that summary judgment is not warranted.  It is unknown whether it will be Mr. O'Leary or InfraSource that will be successful in convincing a

jury that his or its view of these events is correct, but on this record, Mr. O'Leary has generated multiple genuine issues of material fact that can only be resolved by a factfinder.

## III.    CONCLUSION

The Court DENIES InfraSource Transmission Services Company's Motion for Summary Judgment (Docket # 32).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 8th day of December, 2010